# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| LINKSMART WIRELESS TECHNOLOGY, LLC, | ) ) | |
| | ) | **Case No. 2:08-cv-00264-DF-CE** |
| *Plaintiff*, | ) ) | **Case No. 2:08-cv-00304-DF-CE** |
| | ) | **Case No. 2:08-cv-00385-DF-CD** |
| vs. | ) | **Case No. 2:09-cv-00026-DF-CE** |
| | ) | |
| T-MOBILE USA, INC., ET AL., | ) | CONSOLIDATED |
| | ) | |
| *Defendants*. | ) | **Jury Trial Demanded** |
| | ) | |
| AND RELATED COUNTERCLAIMS | ) | |
| | ) | |

## DEFENDANT SBC INTERNET SERVICES, INC. D/B/A AT&T INTERNET SERVICES'S ("AT&T") FIRST AMENDED ANSWER TO PLAINTIFF'S COMPLAINT

Defendant SBC Internet Services, Inc. d/b/a AT&T Internet Services ("AT&T") by and through undersigned counsel, hereby presents its First Amended Answer, Defenses and Counterclaims to Plaintiff Linksmart Wireless Technology, LLC's ("Linksmart") Complaint filed October 10, 2008 (the "Complaint"). All paragraph references refer to the corresponding paragraph in the Complaint.

## PARTIES

1.     AT&T is without knowledge or information sufficient to form a belief as to the averments of Paragraph 1, and therefore denies same.

2.     Admitted.

## JURISDICTION AND VENUE

3.     AT&T admits that Plaintiff's complaint purports to state a cause of action under the Patent Act, 35 U.S.C., but denies that any such claim is meritorious. AT&T admits this Court

may have subject matter jurisdiction over certain patent claims under 28 U.S.C. § 1338(a), but AT&T lacks sufficient information to admit or deny that subject matter jurisdiction exists over this case and, accordingly, denies that it does.

4.      AT&T denies that it has committed acts of infringement or continues to commit acts of infringement anywhere and further denies venue is proper in this Court under 28 U.S.C. §§ 1391(c) and 1400(b).

5.      Paragraph 5 contains conclusions of law and not averments of fact to which an answer is required, but insofar as an answer may be deemed required, AT&T denies any of its activities are "infringing."

### COUNT I

6.      AT&T admits that United States Patent No. 6,779,118 (the "'118 patent") states as its title "User Specific Automatic Data Redirection System" and that Exhibit A to the Complaint appears to be a copy of the '118 patent. AT&T admits that the face of the '118 patent appears to indicate that the '118 patent issued on August 17, 2004, from United States Patent Application No. 09/295,966. AT&T is without knowledge or information sufficient to form a belief as to the remaining averments of Paragraph 6, and therefore denies same.

7.      AT&T admits that Koichiro Ikudome and Moon Tai Yeung appear to be listed on the face of the '118 patent as inventors. AT&T is without knowledge or information sufficient to form a belief as to the remaining averments of Paragraph 7, and therefore denies same.

8.      AT&T denies the allegations in Paragraph 8.

9.      AT&T denies the allegations in Paragraph 9.

10.     AT&T denies the allegations in Paragraph 10.

11.     AT&T denies the allegations in Paragraph 11.

## PRAYER FOR RELIEF

AT&T incorporates herein its responses to Paragraphs 1-11 of the Complaint and denies that Plaintiff is entitled to any relief or judgment against AT&T.

## DEFENSES AGAINST LINKSMART

AT&T asserts the following separate defenses against Plaintiff, without assuming the burden of proof on such defenses that would otherwise rest on Plaintiff.

### First Affirmative Defense

Plaintiff's claims are barred, in whole or in part, for failure to state a claim upon which relief can be granted.

### Second Affirmative Defense

Each and every claim of the '118 patent is invalid for failure to comply with the patent laws, including, but not limited to, 35 U.S.C. §§ 101, 102, 103 and/or 112.

### Third Affirmative Defense

AT&T has not committed any act that would give rise to liability for infringement of any valid, enforceable and properly construed claim of the '118 patent.

### Fourth Affirmative Defense

All or some of Linksmart's claims are barred by laches.

### Fifth Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted against AT&T specifically because AT&T does not engage in any actions or activities for which liability can arise under a claim of patent infringement of the '118 patent.

### Sixth Affirmative Defense

Linksmart's asserted damages are limited by 35 U.S.C. § 287.

## Seventh Affirmative Defense

Venue is inappropriate in this Court.

## Eighth Affirmative Defense

AT&T reserves all affirmative defenses under Rule 8(c) of the Federal Rules of

Civil Procedure, the Patent Laws of the United States, and any other defenses, at law or in

equity, that may now exist or in the future be available based on discovery and further factual

investigation in this case.

## Ninth Affirmative Defense

As set forth with particularity in paragraphs 14-44, inclusive of Count III of the first

amended counterclaims, set forth below, the '118 patent is unenforceable based on inequitable

conduct.

## AT&T'S FIRST AMENDED COUNTERCLAIMS

For its first amended counterclaims against Linksmart, AT&T alleges as follows:

## JURISDICTION AND VENUE

1.      These counterclaims arises under the patent laws of the United States, 35 U.S.C. §

1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202. This Court has subject

matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a) and 2201(a).

2.      Venue in the Eastern District of Texas is proper pursuant to 28 U.S.C. §§ 1391(b),

(c), (d), and 1400(b) because Counter-Defendant Linksmart has subjected itself to the personal

jurisdiction of this Court by filing a complaint.

## FACTUAL BACKGROUND

3.      Linksmart has alleged that it is the assignee of the '118 patent, entitled "User

Specific Automatic Data Redirection System," and that it is entitled to recover for any claim for

4

infringement of the patent.

4.      Linksmart has expressly charged AT&T with infringement of the '118 patent by filing a complaint against AT&T in this Court on October 10, 2008, (doc. 1). AT&T has denied these allegations. Thus, there exists an actual controversy between Linksmart and AT&T regarding the '118 patent.

5.      On July 1, 2008, Linksmart filed a complaint in this Court against Mail Boxes Etc. and Barnes & Noble alleging infringement of the '118 patent. (doc. 1, Case No. 2:08-cv-00264). Mail Boxes Etc. and Barnes & Noble are both customers of AT&T and have denied these allegations.

## COUNT I

### DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT NO. 6,779,118

6.      AT&T repeats and incorporates by reference all of the allegations set forth in paragraphs 1-5.

7.      AT&T has not been and is not now infringing any claim of the '118 patent, either directly or indirectly.

## COUNT II

### DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 6,779,118

8.      AT&T repeats and incorporates by reference all of the allegations set forth in paragraphs 1-5.

9.      Each and every claim of the '118 patent is invalid under 35 U.S.C. § 102.

10.     Each claim of the '118 patent is invalid for obviousness under 35 U.S.C. § 103.

11.     Each claim of the '118 patent is invalid as indefinite under 35 U.S.C. § 112 because a person having ordinary skill in the art would not understand what is claimed when the

claims are read in light of the specification.

12.     Each claim of the '118 patent is invalid under 35 U.S.C. § 112 for failing to enable a person skilled in the art to make and use the claimed invention without undue experimentation.

13.     Each claim of the '118 patent is invalid under 35 U.S.C. § 112 for failure to satisfy the written description requirement.  Specifically, the specification of the '118 patent, to one of skill in the art as of the time of filing, would not demonstrate that the inventors had possession of the full scope of the claimed invention.

## COUNT III

## DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. 6,779,118

14.     AT&T repeats and incorporates by reference all of the allegations set forth paragraphs 1-5.

15.     The '118 patent is unenforceable because of the commission of inequitable conduct in its procurement.  Inventor Koichiro Ikudome ("Ikudome") knowingly failed to disclose material information regarding two prior art products known as the "Intercard" and the "WEBGate card," and he withheld this material information in the prosecution of the '118 patent with a specific intent to deceive the Patent and Trademark Office ("PTO").[1]

### A.     Persons Having a Duty of Candor

16.     The '118 patent in suit issued from U.S. Application Serial No. 09/295,966, which was filed in the United States PTO on April 21, 1999 ("the Ikudome Non-Provisional

---

[1] The term "Intercard" as used herein describes both the Intercard product itself and the system used with the card to allow Internet access, including the InterACS system offered by Auric. The term "WEBGate card" as used herein describes both the WEBGate card product itself and the system used with the card to allow Internet access, including the InterACS system offered by Auric.  The term "Auric" is used interchangeably with the term "Auriq" to identify the company known as AuriQ Systems, Inc., which was previously known as Auric Web Systems, Inc.

Application").  The Ikudome Non-Provisional Application claims priority to U.S. Provisional

Application Serial No. 60/084,014, filed May 4, 1998 ("the Ikudome Provisional Application").

The named inventors are Mr. Ikudome and Mr. Moon Tai Yeung.  The inventors, their attorneys

and persons substantively involved in the prosecution of the '118 patent had a duty of candor and

good faith in their dealings with the PTO.  *See* 37 C.F.R. § 1.56.

### B. The Materiality of the Intercard and the WEBGate Card to the Claims of the '118 Patent

17.     The specification of the '118 patent, in one or more embodiments, describes a

system that utilizes a "redirection server" to control access to the Internet (*see, e.g.,* '118 patent,

col. 2, lines 61-65).  Individuals who are trying to access the Internet are authenticated by a

username and password through an authentication and accounting server  (*see, e.g.,* '118 patent,

col. 3, lines 1-3).  The authentication accounting server sends the particular user's filter and

redirection information to a redirection server (*see, e.g.,* '118 patent, col. 3, lines 8-10).  In one or

more embodiments described in the specification, the redirection server causes users to be

forcibly "redirected" to specific locations (*see, e.g.,* '118 patent, col. 5, lines 22-32).

18.     Independent claims 1 and 8 of the '118 patent recite, inter alia, a system with

several components that include a database, a dial-up network server, a redirection server, and an

authentication accounting server.  Independent claims 15 and 25 of the '118 patent recite, inter

alia, a system with a redirection server.  In its Opening Claim Construction Brief ("Brief") filed

in this action, Linksmart has proposed definitions for a number of these terms used in the claims.

Linksmart has defined a "dial-up network server" as a server that is used to establish a temporary

communications link to a network (Brief, p. 10); a "redirection server" as a server that controls

the user's access to the network (Brief, p. 11); and an "authentication accounting server" as a

server that determines whether a user ID is authorized to access the network (Brief, p. 4).

7

Linksmart's Brief also states that the "redirection server" is not limited to redirection

functionality, but includes performing other tasks such as blocking and allowing (Brief, p. 11).

Linksmart argues that the "temporarily assigned network address" is simply meant to be an

address that identifies a user when the user is connected to the system (Brief, p. 12).  Linksmart's

Brief states that "automatic modification" of rule sets includes rule sets that are modified as a

result of conditions (Brief, p. 17) and that "modifying at least a portion of the user's rule set"

simply refers to changing one of the elements or conditions in the rule set (Brief, p. 21).

19.    "[T]he PTO must apply the broadest reasonable meaning to the claim language,

taking into account any definitions presented in the specification."  *In re Bass*, 314 F.3d 575, 577

(Fed. Cir. 2002).  Therefore, claim constructions and definitions proposed by Linksmart in its

Brief should be used in assessing the materiality of any prior art reference, regardless of whether

the Court ultimately agrees with Linksmart's proposed constructions.

20.    The Intercard product was a prepaid Internet access card (DX4) that is described

in detail in an Auriq "white paper" (DX9) (Auriq Dep., p. 59-60).[2]  The Intercard product is

described in several press releases and publications, including  a Business Wire press release

dated October 8, 1996 (DX4); an Internet Week article dated February 17, 1997 (DX5); a

CardTrak article dated July 14, 1997 (DX6); and a PC World article dated July 14, 1997 (DX7).

The Intercard system, or a similar system with a different name, was successfully launched in

Japan in July 1996 by Tokyo Internet Corporation (DX4, DX6, DX17) (Auriq Dep., p. 27-28, 50,

80-81).  By March 1999, the Tokyo Internet system had been in operation for over 30 months

without any problems and it successfully supported over 200,000 accounts (DX17) (Auriq Dep.,

---

[2] References to "Auriq Dep." are to the March 4, 2010 deposition of Mr. Koichiro Ikudome as
the Rule 30(b)(6) designee of Auriq.  References to "DX" are to Defendants' deposition exhibits
marked at the Auriq Rule 30(b)(6) deposition.

p. 80-81).  Auric's predecessor, INFOgy, and SEER Technologies provided documentation for use of the Intercard product (or a similar product with a different name) in Japan, including a user manual, operation manual, administrator's manual and detailed description of the product (Auriq Dep., p. 35).  The October 8, 1996 article (DX4) describes the use of the Intercard for prepaid Internet access in the United States.  An Internet Week article (DX5), dated February 17, 1997, described the prepaid Internet access card system as being sold and/or offered for sale, to Sprint, MCI Communications and GTE (DX5).

21.     The Intercard product constitutes prior art to the '118 patent under 35 U.S.C. §§ 102 and 103 based on the filing date of the Ikudome Provisional Application.  The Intercard product constitutes prior art to the '118 patent under 35 U.S.C. §§ 102 and 103 based on the filing date of the Ikudome Non-Provisional Application.  Publications in the United States and in Japan, as well as public use, sales and offers for sale in the United States, of the Intercard product occurred more than one year prior to the filing date of the Ikudome Provisional Application and more than one year prior to the filing date of the Ikudome Non-Provisional Application.

22.     The Intercard product provided prepaid Internet access to a user through a dial-up modem.  Users of the Intercard product dialed a telephone number (i.e., an 800-number) with their computer dialer (Auriq Dep., p. 28).  The dialer software required insertion of a username (or user ID) and password (or PIN).  The 800-number, username and password were all printed on the Intercard (Auriq Dep., p. 28). The 800-number connected the user with an Internet Service Provider, specifically, the Auric web server (Auriq Dep., p. 93-94).  When the Auric server responded to the call signal from the user's computer dialer, the user ID and password were then authenticated with an AAA server and database (Auriq Dep., p. 29-30, 93-94, 101-102).  The

AAA server was a RADIUS server, or a server using the RADIUS protocol (Auriq Dep., p. 58).
After authentication by the AAA server, the user would be connected to the Internet (Auriq Dep.,
p. 93-94, 101).  Upon connection with the Internet, a timer was set and allowed the user to access
the Internet for the duration of time remaining on the card (Auriq Dep., p. 102).  At the end of
the time period, the user was disconnected (Auriq Dep., p. 31-32, 103-04).  The user was tracked
with an IP address (Auriq Dep., p. 32-33, 103-04).  Auriq was hosting such a system in the
United States by July 1997 (Auriq Dep., p. 50-51).  The system for use with Intercard, which was
offered for sale by Auric in February 1997, included the functionality of cards having an 800-
number, user ID, and password as well as an authentication system (Auriq Dep., p. 42-43).  The
authentication system used a RADIUS server (Auriq Dep., p. 48).  Auric built a demonstrator
that showed the Intercard product in operation, involving a website and purchases on a website
(DX5, DX20; Auriq Dep., p. 46, 86-88).  The demonstrator website included input fields for
providing the user ID and password (DX10, p. LS5278; Auriq Dep., p. 62-63).  The website
allowed the user to determine the amount of prepaid Internet access time that remained available
for use with the card (DX7).

23.     InterACS was a prepayment processing system for the Intercard, and later for the
WEBGate card, that was built and offered for sale by Auric (Auriq Dep., p. 109).  InterACS was
marketed as early as March 25, 1997 (DX23; Auriq Dep., p. 108).  InterACS provided support
for the prepaid access cards, and it involved an authentication and accounting server in the form
of RADIUS technology (Auriq Dep., p. 109).  InterACS is described in "white papers" as an
extension of RADIUS technology (DX24, DX25).  An Internet Week article, dated February 17,
1997, described the system as being sold, and offered for sale, to Sprint, MCI Communications
and GTE (DX5).

24.     Stored Value Marketing ("SVM") was a reseller of the Intercard and the WEBGate card.  On September 18, 1997, SVM signed an agreement with Auric (DX11) to resell the Intercard, which was later renamed the WEBGate card (Auriq Dep., p. 63).  SVM initially purchased 10,000 cards (DX12, DX13) (Auriq Dep., p. 68).  Redirection technology, which forced a user to a specific website, was available with these 10,000 cards (DX14) in November 1997 (Auriq Dep., p. 70-71, 75-76).  SVM later resold the WEBGate card with the redirection technology.  In November 1997, Auric built a demonstrator for SVM and other clients to show the redirection technology and how it worked (DX19, DX20) (Auriq Dep., p. 71).

25.     The WEBGate card product provided prepaid Internet access to users (DX26). WEBGate was a change in the name of the Intercard (Auriq Dep., p. 119, 124).  The WEBGate card included redirection technology that forced a user to a specific website after authentication (DX26, DX27; Auriq Dep., p. 115-16).  WEBGate cards required the user to authenticate in the same manner as the Intercard (Auriq Dep., p. 115-16).  After connection, the user seeking access to the Internet would type a desired website, such as "yahoo.com," into their browser and the redirection would first force the user to a sponsor's website to view an advertisement (DX27, Auriq Dep., p. 116, 126, 131).

26.     The public availability of the WEBGate card was announced on August 1, 1997 (DX27, Auriq Dep., p. 135) and the card was offered for sale and sold by SVM at least by September 18, 1997 (DX15, DX28, Auriq Dep., p. 136-37).  The WEBGate card with redirection was offered for sale to Chrysler Financial on March 25, 1998 (DX29, Auriq Dep., p. 137-40). That offer for sale included a system in which the user was subjected to a survey upon reaching the sponsor's website.  WEBGate cards were also sold by MHA Communications (DX32, DX33, Auriq Dep., p. 146-48).  Auric documents described the WEBGate card and making Internet

connections with the WEBGate card (DX28, DX30, DX31, Auriq Dep., p. 146).  A version of the WEBGate card was marketed, used and sold by Japan Telecomm in Japan.  The WEBGate card offered by Japan Telecomm was known as the ODN card and it was offered for sale in October 1998 (DX27, Auriq Dep., p. 129-30).  An Auric "Auto-Navigation" system, which included the redirection technology, was used with the ODN card in Japan starting in March 1998 (DX27, Auriq Dep., p. 131-32).  A business plan for the ODN card was discussed with Japan Telecomm on December 15, 1997 (DX34, Auriq Dep., p. 150).  The system utilized redirection, or forced connection to a company website (DX34, p. LS659, LS663).  Auric was responsible for authentication, billing and issuance of user IDs (DX34, p. LS661).  The system was designed to utilize the Auric authentication server in the United States (DX34, p. LS676).  A pilot system was started in March 1998 (DX38).

27.     Articles describing the ODN card appeared in the Yomiuri on-line on February 20, 1998 (DX36), Asahi.com on-line newpaper on March 27, 1998 (DX38, Auriq Dep., p. 162), and in Nikkei Trendy magazine in May 1998 (DX37, Auriq Dep., p. 160-61). The Asahi.com on-line article disclosed that the user is automatically connected to asahi.com upon connection, after which they can view other web pages (DX38).  Screen shots illustrate an ODN card with an expiration of March 1, 1998 (DX40, Auriq Dep., p. 164). The pilot system for the Auto-Navigation (or redirection) of the ODN for Japan Telecomm required authentication through the Auric server in the United States (DX41, Auriq Dep., p. 166-67).  Auric also offered a prepaid card through Nikkei, which, in October 1997, provided a sign-up page upon expiration of the user's time period (DX42, Auriq Dep., p. 170).

28.     The WEBGate card product constitutes prior art to the '118 patent under 35 U.S.C. §§ 102 and 103 based on the filing date of the Ikudome Non-Provisional Application.

Publications in the United States and in Japan, as well as public use, sales and offers for sale in the United States, of the WEBGate card product, occurred more than one year prior to the filing of the Ikudome Non-Provisional Application.

29.    The Intercard is material to at least claims 1, 5, 12, 15, 16, 17, 19, 22, 23 and 25 of the '118 patent.  An exemplary detailed comparison between claims 1 and 15 of the '118 patent, as the claims have been construed by Linksmart, and the disclosure of the Intercard product, is set forth as follows:

| Claims of U.S. Patent No. 6,779,118 | Intercard |
| --- | --- |
| 1. A system comprising:<br>a database with entries correlating each of a plurality of user IDs with an individualized rule set; | A system for controlling access to a public network (the Internet) is implemented by use of the Intercard (DX4, DX9; Auriq Dep., p. 59-60).<br><br>The Auric server verifies the user name and PIN number on the Intercard based on database entries (Auriq Dep., p. 29-30, 93-94, 101-02). |
| a dial-up network server that receives user IDs from users' computers; | Access to the Auric server with the Intercard is through a dial-up connection from software installed on the user's computer (Auriq Dep., p. 28). |
| a redirection server connected to the dial-up network server and a public network, and an authentication accounting server connected to the database, the dial-up network server and the redirection server; | Linksmart's proposed claim construction defines a "redirection server" as a "server that controls the user's access to the network." (Linksmart Opening Claim Construction Brief ("Brief"), p. 11).  Linksmart's proposed claim construction defines an "individualized rule set" as elements or conditions which apply during a user's session (Id., p. 7).<br><br>The Auric server used with the Intercard controls access to the Internet (Auriq Dep., p. 93-94, 101). The user is allowed access to the Internet for a set time period and then disconnected (Id., p. 102).  The Auric server also verifies the user name and PIN by access to a database (Id. p. 29-30, 93-94, 101-02). |
| wherein the dial-up network server communicates a first user ID for one of the users' computers and a temporarily assigned | The Auric server receives the user PIN from the dial-up server, and provides authentication for connection to the Internet (Auriq Dep., 28). |

| Claims of U.S. Patent No. 6,779,118 | Intercard |
|---|---|
| network address for the first user ID to the authentication accounting server; | The user is assigned a temporary IP address (Id., p. 32-33). |
| wherein the authentication accounting server accesses the database and communicates the individualized rule set that correlates with the first user ID and the temporarily assigned network address to the redirection server; | Linksmart's proposed claim constructions define an authentication accounting server as "a server  that determines whether a user ID is authorized to access the network." (Brief, p. 11)<br><br>The Intercard uses the Auric server and database to determine whether the user is authorized and permits the user access to the Internet for a set time limit (Auriq Dep., 29-30, 93-94, 101-02). |
| and wherein data directed toward the public network from the one of the users' computers are processed by the redirection server according to the individualized rule set. | Linksmart's  proposed claim constructions define the redirection server as a server that controls the user's access to the network. (Brief, p. 11)<br><br>The Auric server controls whether Intercard users are given access to the Internet (Auriq Dep., p. 29-30, 93-94, 101-02). |
| 15. A system comprising:<br><br> a redirection server programmed with a user's rule set correlated to a temporarily assigned network address; | The Intercard is a system for controlling access to a public network (the Internet) from user's computers.  Linksmart's claim constructions define a redirection server as a server that controls the user's access to the network. (Brief, p. 11).<br><br>Authentication of users is based on username and password, and correlated to an IP address (Auriq Dep., p. 29-30, 93-94, 101-02). |
| wherein the rule set contains at least one of a plurality of functions used to control passing between the user and a public network; | The Auric server receives user IDs from user computers (Id).  The Auric server is connected to the dial-up network and to a public network (the Internet) (Id).  The Auric server authenticates/authorizes access to the public network (Id.).  Authentication of users is based on username, password and IP address (Id., p. 32-33). |
| wherein the redirection server is configured to allow automated modification of at least a portion of the rule set correlated to the temporarily assigned network address; | Linksmart's  infringement contentions identify the rule set being automatically modified when the user's access privileges expire.<br><br>The Auric server allows Internet access for users of the Intercard for the period of time |

| Claims of U.S. Patent No. 6,779,118 | Intercard |
|---|---|
|  | allotted on the card (Id., p. 31-32, 103-04). |
| and wherein the redirection server is configured to allow modification of at least a portion of the rule set as a function of some combination of time, data transmitted to or from the user, or location the user access. | Linksmart's  infringement contentions identify the rule set being automatically modified when the user's access privileges expire.<br><br>The Auric server allows access to the Internet. Time limitations are placed on the user based on the prepaid access card (Auriq Dep., p. 31-32, 103-04). |

The identified aspects of the Intercard are material to similar recitations in claims 5, 12, 16, 17, 19, 22, 23 and 25 of the '118 patent.

30.     The WEBGate card is material to at least claims 1, 5, 12, 15, 16, 17, 19, 22, 23 and 25 of the '118 patent.  An exemplary detailed comparison between claims 1 and 15 of the '118 patent, as the claims have been construed by Linksmart, and the disclosure of the WEBGate card product, is set forth as follows:

| Claims of U.S. Patent No. 6,779,118 | WEBGate Card |
|---|---|
| 1. A system comprising:<br>a database with entries correlating each of a plurality of user IDs with an individualized rule set; | A system for controlling access to a public network (the Internet) or the sponsor's site on a public network, is implemented by use of the Auric Server, with specific user IDs on the WEBGate card (DX26, DX27, Auriq Dep., p. 115-16).<br><br>The Auric server verifies the user name and PIN number based on database entries (Auriq Dep., p. 115-16). |
| a dial-up network server that receives user IDs from users' computers; | Linksmart's Opening Claim Construction Brief ("Brief") identifies a "server that is used to establish a temporary communications link to a network" as meeting the limitation of a dial-up network server.<br><br>The Auric Server acts as a dial-up network server when it receives user IDs (PINs) from users' computers (Id., p. p. 29-30, 93-94, 101-02, 115-16).  Access to the Auric server is through a dial-up connection from software |

| Claims of U.S. Patent No. 6,779,118 | WEBGate Card |
|---|---|
| | installed on the user's computer (Id). |
| a redirection server connected to the dial-up network server and a public network, and an authentication accounting server connected to the database, the dial-up network server and the redirection server; | Linksmart's Brief identifies a "server that controls the user's access to the network" as meeting the limitation of a redirection server.<br><br>The Auric redirection server is connected to the Auric dial-up server, and controls access to the Internet (Auriq Dep., p. 93-94, 101, 115-16).  The Auric server also verifies the user name and PIN by access to a database in order to correlate the user with the specific sponsor (Id).  The Auric server authenticates/authorizes access and then redirects the user to the sponsor's website (DX27, Auriq Dep., p. 116, 126, 131).  The Auric server grants/denies further access to the Internet (Id). |
| wherein the dial-up network server communicates a first user ID for one of the users' computers and a temporarily assigned network address for the first user ID to the authentication accounting server; | The Auric server receives the user ID and password, and provides authentication for connection to the sponsor's website and then to the Internet (Id.).  The user is assigned a temporary IP address (Id., p. 32-33). |
| wherein the authentication accounting server accesses the database and communicates the individualized rule set that correlates with the first user ID and the temporarily assigned network address to the redirection server; | Linksmart's proposed claim constructions define an authentication accounting server as "a server  that determines whether a user ID is authorized to access the network." (Brief, p. 11).<br><br>After verifying the PIN to authenticate the user, the Auric server directs the user's browser to the Internet domain/homepage of the sponsor (Auriq Dep., p. p. 29-30, 93-94, 101-02, 115-16, 126, 131). |
| and wherein data directed toward the public network from the one of the users' computers are processed by the redirection server according to the individualized rule set. | The Auric server directs the user's browser to the Internet domain/homepage of the sponsor (Id). |
| 15. A system comprising:<br><br> a redirection server programmed with a user's rule set correlated to a temporarily assigned network address; | Linksmart's Brief identifies a "server that controls the user's access to the network" as meeting the limitation of a redirection server.<br><br>The Auric server is a system for controlling access to a public network (the Internet) from user's computers (Auriq Dep., p. 29-30, 93-94, 101-02, 115-16).  Authentication of users is based on username, password and IP address |

| Claims of U.S. Patent No. 6,779,118 | WEBGate Card |
|---|---|
| | (Id., p. 32-33). |
| wherein the rule set contains at least one of a plurality of functions used to control passing between the user and a public network; | Linksmart's  infringement contentions identify the exchange of data over the Internet by the user, and the rule set dictating that the redirection server redirect the user to an authentication page, as meeting this limitation.<br><br>The Auric server receives user IDs from user computers.  The Auric server is connected to the dial-up network and to a public network (the Internet) (Auriq Dep., p. 29-30, 93-94, 101-02, 115-16).  The Auric server authenticates/authorizes access to the sponsor's site and to the public network (Id).  Authentication of users is based on username, password and IP address (Id., p. 32-33).  The Auric server controls passing between a user and a public network (the Internet) based on the rules applied to the user credentials. |
| wherein the redirection server is configured to allow automated modification of at least a portion of the rule set correlated to the temporarily assigned network address; | Linksmart's  infringement contentions identify a default rule set to redirect the user to an authentication page, and the rule set being automatically modified when the user's access privileges expire, as meeting this limitation.<br><br>A first time user is redirected to the sponsor's site (Auriq Dep., p. 116, 126, 131).  After visiting the site, a different filtering rule is applied that allows all traffic coming from the user's computer to be forwarded to the Internet at large (Id., p. 138-39).  When the time on the user's account expires, the user's Internet access is terminated (Id., p. 31-32, 103-04). |
| and wherein the redirection server is configured to allow modification of at least a portion of the rule set as a function of some combination of time, data transmitted to or from the user, or location the user access. | Linksmart's  infringement contentions identify a default rule set to redirect the user to an authentication page, and the rule set being automatically modified when the user's access privileges expire, as meeting this limitation.<br><br>The Auric server allows access from the sponsor's site to the Internet (Auriq Dep., p. 138-39).  Time limitations are placed on the user based on the prepaid access card (Id., p. 102-04). The Auric server filtering rule is modified according to the location the user accesses. |

The identified aspects of the WEBGate card are material to similar recitations in claims 5, 12, 16, 17, 19, 22, 23 and 25 of the '118 patent.

31.     The materiality of the Intercard and/or the WEBGate card to the claims of the '118 patent is also demonstrated by how the PTO Examiner would have used the Intercard and/or WEBGate card in assessing the patentability of the claims of the '118 patent.  In the prosecution of the application for the '118 patent, in a Amendment filed on or about July 30, 2001 ("Amendment"), at p. 6, the applicants distinguished the prior art International Publication No. WO 96/05549 to Horowitz ("Horowitz") as being "quite different" from the claims that are "directed toward a system involving dial up network servers and redirection servers that are involved in the connection of a user to a public network, such as the Internet."  The applicants distinguished the filters of Horowitz as being "based upon predetermined resources on the local computer network."  (Id.).  The disclosure of the Intercard and/or WEBGate card, as described above, refutes or is inconsistent with this argument of patentability and would have provided the PTO Examiner with a reference having the features allegedly missing from Horowitz. Specifically, the Intercard and/or WEBGate card references would have provided the PTO Examiner with a reference showing a system involving dial up network servers and redirection servers that are involved in the connection of a user to the Internet, as those terms have been defined by Linksmart in this action.

32.     In the prosecution of the application for the '118 patent, in the Amendment, at p. 7, the applicants stated that they "fail to discern a disclosure in Horowitz of allowing modification of a portion of a rule set as set forth in claim 15 and, particularly, allowing the automated modification of at least a portion of the rule set."  The disclosure of the Intercard and/or WEBGate card, as described above, refutes or is inconsistent with this argument of

patentability and would have provided the PTO Examiner with a reference having the features allegedly missing from Horowitz.  Specifically, the Intercard and/or WEBGate card references would have provided the PTO Examiner with a reference showing a system allowing automated modification of at least a portion of the rule set, as those terms have been defined by Linksmart in this action.

33.     In the prosecution of the application for the '118 patent, in a Response to Final Action ("Response"), filed on or about October 22, 2002, at p. 1-2, the applicants distinguished Horowitz as not involving "data directed toward the public network."  The applicants provided numerous alleged distinctions between a private network and a public network.  The disclosure of the Intercard and/or WEBGate card, as described above, refutes or is inconsistent with this argument of patentability and would have provided the PTO Examiner with a reference having the features allegedly missing from Horowitz.  Specifically, the Intercard and/or WEBGate card references would have provided the PTO Examiner with a reference showing a system involving a redirection server that is involved in the connection of a user to a public network (i.e., the Internet), as those terms have been defined by Linksmart in this action.

34.     In the prosecution of the application for the '118 patent, in the Response, filed on or about October 22, 2002, at p. 3, the applicants distinguished Horowitz as not involving "redirection."  The applicants argued that "redirection" involves the server directing the user to another area of the network.  The disclosure of the Intercard and/or WEBGate card, as described above, refutes or is inconsistent with this argument of patentability and would have provided the PTO Examiner with a reference having the features allegedly missing from Horowitz. Specifically, the Intercard and/or WEBGate card references would have provided the PTO Examiner with a reference showing a system involving a redirection server that is involved in

redirecting a user to a public network (i.e., the Internet), as those terms have been defined by Linksmart in this action.

35.     In the prosecution of the application for the '118 patent, in an Appellant's Brief, filed on or about November 22, 2002, at p. 4-7, the applicants distinguished Horowitz as not involving "data directed toward the public network."  The applicants provided numerous alleged distinctions between a private network and a public network.  The disclosure of the Intercard and/or WEBGate card, as described above, refutes or is inconsistent with this argument of patentability and would have provided the PTO Examiner with a reference having the features allegedly missing from Horowitz.  Specifically, the Intercard and/or WEBGate card references would have provided the PTO Examiner with a reference showing a system involving a redirection server that is involved in the connection of a user to a public network (i.e., the Internet), as those terms have been defined by Linksmart in this action.

36.     In the prosecution of the application for the '118 patent, in Applicant's Reply Brief, filed on or about June 30, 2003, at p. 1, the applicants stated that Horowitz contains no teaching or suggestion of "allowing modification of a portion of a rule set correlated to the temporarily assigned network address."  The disclosure of the Intercard and/or WEBGate card, as described above, refutes or is inconsistent with this argument of patentability and would have provided the PTO Examiner with a reference having the features allegedly missing from Horowitz.  Specifically, the Intercard and/or WEBGate card references would have provided the PTO Examiner with a reference showing a system allowing modification of at least a portion of a rule set correlated to the temporarily assigned network address, as those terms have been defined by Linksmart in this action.

37.     In the prosecution of the '118 patent, the PTO Examiner issued a Notice of

Allowability on or about February 19, 2004.  In the Examiner's Statement of the Reasons for

Allowance, p. 2, the Examiner stated that "the closest prior art" was Grube U.S. Patent No.

6,157,829 ("Grube").  The Examiner found that Grube does not disclose the elements of claims 1

and 8 "wherein the authentication accounting server accesses the database and communicates the

individualized rule set that correlates with the first user ID and the temporarily assigned network

address to the redirection server, and wherein data directed toward the public network from one

of the user's computers are processed by the redirection server according to the individualized

rule set."  The Examiner found that Grube does not disclose the element of claim 15 "wherein the

redirection server is configured to allow automated modification of at least a portion of the rule

set correlated to the temporarily assigned network address."  The disclosure of the Intercard

and/or WEBGate card, as described above, would have provided the PTO Examiner with a

reference having the features allegedly missing from Grube.  Specifically, the Intercard and/or

WEBGate card references were both more relevant to the claims than what the Examiner found

to be the "closest prior art," as the claim terms have been defined by Linksmart in this action, and

thus demonstrates that materiality of the Intercard and/or WEBGate card.

C.     **Ikudome's Knowledge and Understanding of the Scope Being Accorded to the Claims of the '118 Patent**

38.     On or about June 6, 1999, Ikudome signed a declaration, which was filed in the

PTO in the application for the '118 patent.  In that declaration, Ikudome declared, among other

things, that he had reviewed and understood the contents of the Ikudome Non-Provisional

Application, which was filed on April 21, 1999 as U.S. Application No. 090/295,966, including

the claims of the application.  The declaration also indicates that Ikudome acknowledged the

duty to disclose information that is material to patentability as defined in 37 CFR § 1.56.

**D.**     **Ikudome's Knowledge and Understanding of the Materiality of the Intercard and WEBGate card Prior Art References**

39.     Ikudome is an owner and employee of Auriq, which is the owner of Linksmart (Auriq Dep., p. 11, 241).  Ikudome is Vice President of Linksmart, which does not have any employees on its payroll (Auriq Dep., p. 249, 253).  Ikudome has been involved in the business of Auriq since its inception (Auriq Dep., p. 240-41).  Ikudome was involved in the development, marketing and sale of the Intercard, and the development, marketing and sale of the WEBGate card.  Ikudome fully understood the details of the Intercard product and the WEBGate card, and the details of the use of the cards to provide prepaid Internet access.  Throughout the time period that the application for the '118 patent was pending, including the pendency of the Ikudome Provisional Application and the Ikudome Non-Provisional Application, Ikudome fully understood the details of the Intercard and the WEBGate card; the operation of the systems with those cards to provide Internet access; and the details of various publications and offers for sale of the Intercard and the WEBGate card.

**E.**     **Ikudome's Intentional Failure to Cite the Intercard and/or WEBGate card as Prior Art References in the Prosecution of the '118 Patent**

40.     Neither the Intercard nor the WEBGate card were cited as prior art in the prosecution of the '118 patent.  Ikudome and his attorneys filed two information disclosure statements ("IDS") in the prosecution of the '118 patent.  On or about October 22, 1999, Ikudome filed an IDS that cited U.S. Patent No. 5,696,898 ("the Baker '898 patent") as well as the Horowitz publication.  On or about July 19, 2000, Ikudome filed an IDS that cited two additional references and provided a copy of a search report from a counterpart PCT application.

41.     The IDS filed on October 22, 1999, included a copy of the Baker '898 patent, which Ikudome had discussed in the Ikudome Non-Provisional Application.  Specifically, Ikudome told the PTO in the Ikudome Non-Provisional Application that the Baker '898 patent

disclosed a proxy server that could only block or allow terminals' access to remote websites. Ikudome also told the PTO in the Ikudome Non-Provisional Application that the system disclosed in the Baker '898 patent is "static" in that rules programmed into the database need to be reprogrammed in order to change which locations specific terminals may access.  Although Ikudome chose to disclose the Baker '898 patent in an IDS, the IDS did not include the more relevant Intercard and/or WEBGate card references, which contained a redirection server and which allowed form automatic modification of rule sets, as described above, and as those terms have been defined by Linksmart in this action.

42.     The IDS filed on October 22, 1999, included a copy of Horowitz, which was applied by the PTO Examiner in rejecting the claims during the prosecution of the '118 patent. As described above, Ikudome distinguished Horowitz as not involving "data directed toward the public network" and not having "redirection."  Although Ikudome chose to disclose Horowitz in an IDS, the IDS did not include the more relevant Intercard and/or WEBGate card references, which involved data directed toward the public network and involved redirection, as described above, and as those terms have been defined by Linksmart in this action.

43.     In light of:

(a) the citation of information less relevant than the Intercard and/or WEBGate card references, including the Baker '898 patent and the Horowitz reference;

(b) Ikudome's intimate involvement in the development of the Intercard and WEBGate card, and Ikudome's understanding of the systems used to implement those cards, as well as publications describing those references and Auriq's efforts to market those products;

(c) the high degree of relevance of the Intercard and/or the WEBGate card to the distinctions made by Ikudome to the PTO Examiner over Horowitz during the prosecution of the '118 patent;

(d) the PTO Examiner's indication that he understood the closest prior art to be Grube; and,

(e) Ikudome's own statements in a declaration that he understood the contents of the claims for the '118 patent;

the single most reasonable inference to be drawn from this evidence is that Ikudome knew of the materiality of the Intercard and/or WEBGate card, and that he withheld information concerning the Intercard and/or WEBGate card during the prosecution of the '118 patent, with a specific intent to deceive the PTO.

44.     Pursuant to the provisions of 35 U.S.C. § 285, this action qualifies as an exceptional case supporting an award of attorney fees, costs and expenses for AT&T.

## DEMAND FOR JURY TRIAL

AT&T demands a trial by jury of all issues triable in this action.

## PRAYER FOR RELIEF

WHEREFORE, AT&T prays for judgment in its favor and against Linksmart as follows:

1.     Plaintiff Linksmart be denied all relief including specifically all requested monetary, equitable and injunctive relief, and take nothing;

2.     Judgment be entered that AT&T has not, and does not, infringe, directly or indirectly, any properly construed, valid claim of the '118 patent;

3.     Judgment be entered that the '118 patent is invalid;

4.     Judgment be entered that the '118 patent is unenforceable.

5.      This case be declared exceptional pursuant to 35 U.S.C. § 285 and that this Court

award AT&T the costs of this action, including reasonable attorneys' fees and litigation

expenses;

6.      AT&T be awarded such other and further relief as the Court deems just and

proper.

DATED:  April 22, 2010                    Respectfully submitted,

                                           /s/ Richard A. Sayles_____

                                          Richard A. Sayles
                                          Eve L. Henson
                                          SAYLES │ WERBNER
                                          A Professional Corporation
                                          1201 Elm Street
                                          4400 Renaissance Tower
                                          Dallas, TX 75270
                                          214-939-9700
                                          214-939-8787 (fax)

                                          David T. Pritikin
                                          Hugh A. Abrams
                                          Lisa Schneider
                                          Elizabeth L. Maxeiner
                                          Sidley Austin LLP
                                          One South Dearborn Street
                                          Chicago, IL 60603
                                          Telephone: (312) 853-7000
                                          Facsimile: (312) 853-7036


                                          **Attorneys for SBC Internet Services, Inc d/b/a
                                          AT&T Internet Services**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the following counsel of record have deemed to have consented to electronic service and are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on April 22, 2010.


*/s/* Elizabeth L. Maxeiner

---

### *Linksmart Wireless Network, LLC*

Marc A. Fenster
**Russ August & Kabat**
12424 Wilshire Boulevard
12th Floor
Los Angeles, CA  90025
Tel:     (310) 826-7474
Fax:     (310) 826-6991
Email:  mfenster@raklaw.com

Andrew D. Weiss
**Russ August & Kabat**
12424 Wilshire Boulevard
12th Floor
Los Angeles, CA  90025
Tel:     (310) 826-7474
Fax:     (310) 826-6991
Email:  aweiss@raklaw.com

Larry C. Russ
**Russ August & Kabat**
12424 Wilshire Boulevard
12th Floor
Los Angeles, CA  90025
Tel:     (310) 826-7474
Fax:     (310) 826-6991
Email:  lruss@raklaw.com

Stanley H. Thompson, Jr.
**Russ August & Kabat**
12424 Wilshire Boulevard
12th Floor
Los Angeles, CA  90025
Tel:     (310) 826-7474
Fax:     (310) 826-6991
Email: sthompson@raklaw.com

Andrew W. Spangler
**Spangler Law PC**
208 N. Green Street
Suite 300
Longview, TX  75601
Tel:     (903) 753.9300
Fax:     (903) 553.0403
Email:  spangler@spanglerlawpc.com

Alexander Chester Giza
**Russ August & Kabat**
12424 Wilshire Boulevard
12th Floor
Los Angeles, CA  90025
Tel:     (310) 826-7474
Fax:     (310) 826-6991
Email:  agiza@raklaw.com

**T-Mobile USA, Inc.**
**Cisco Systems, Inc.**

David B. Bassett
**Wilmer Cutler Pickering Hale & Dorr**
399 Park Avenue
New York, NY 10022
Tel:     (212) 230-8800
Fax:     (212) 230-8888
Email: David.Bassett@wilmerhale.com

Joyce Chen
**Wilmer Cutler Pickering Hale & Dorr**
399 Park Avenue
New York, NY 10022
Tel:     (212) 230-8800
Fax:     (212) 230-8888
Email: joyce.chen@wilmerhale.com

Alexandra B. McTague
**Wilmer Cutler Pickering Hale & Dorr**
399 Park Avenue
New York, NY 10022
Tel:     (212) 230-8800
Fax:     (212) 230-8888
Email: alexandra.mctague@wilmerhale.com

Peter M. Dichiara
**Wilmer Cutler Pickering Hale & Dorr**
60 State Street
Boston, MA  02109
Tel:     (617) 526-6556
Fax:     (617) 526-5000
Email: peter.dichiara@wilmerhale.com

David J. Beck
**Beck Redden & Secrest LLP**
One Houston Center
1221 McKinney St.; Suite 4500
Houston, TX  77010-2020
Tel:     (713) 951-3700
Fax:     (713) 951-3720
Email: dbeck@brsfirm.com

James P. Barabas
**Wilmer Cutler Pickering Hale & Dorr**
399 Park Avenue
New York, NY 10022
Tel:     (212) 230-8800
Fax:     (212) 230-8888
Email:  james.barabas@wilmerhale.com

Noah A. Levine
**Wilmer Cutler Pickering Hale & Dorr**
399 Park Avenue
New York, NY 10022
Tel:     (212) 230-8800
Fax:     (212) 230-8888
Email: Noah.Levine@wilmerhale.com

William F. Lee
**Wilmer Cutler Pickering Hale & Dorr**
60 State Street
Boston, MA  02109
Tel:     (617) 526-6556
Fax:     (617) 526-5000
Email: william.lee@wilmerhale.com

Jonathan Andron
**Wilmer Cutler Pickering Hale & Dorr**
60 State Street
Boston, MA  02109
Tel:     (617) 526-6749
Fax:     (617) 526-5000
Email: jonathan.andron@wilmerhale.com

Robert David Daniel
**Beck Redden & Secrest LLP**
One Houston Center
1221 McKinney St.; Suite 4500
Houston, TX  77010-2020
Tel:     (713) 951-3700
Fax:     (713) 951-3720
Email: bddaniel@brsfirm.com

**T-Mobile USA, Inc.**
**Cisco Systems, Inc.**

Michael Ernest Richardson
**Beck Redden & Secrest LLP**
One Houston Center
1221 McKinney St.; Suite 4500
Houston, TX  77010-2020
Tel:     (713) 951-3700
Fax:     (713) 951-3720
Email: mrichardson@brsfirm.com

Kirk R. Ruthenberg
**Sonnenschein Nath & Rosenthal LLP**
1301 K Street, NW
Suite 600E
Washington, DC  20005
Tel:     (202) 408-6410
Fax:     (202) 408-6399
Email: kruthenberg@sonnenschein.com


**iBAHN General Holdings Corp.**

Michael E. Jones
**Potter Minton PC**
110 North College
500 Plaza Tower
Tyler, TX  75702
Tel:     (930) 597-8311
Fax:     (903) 593-0846
Email: mikejones@potterminton.com

Allen F. Gardner
**Potter Minton PC**
110 North College
500 Plaza Tower
Tyler, TX  75702
Tel:     (903) 597-8311
Fax:     (903) 593-0846
Email: allengardner@potterminton.com

David J. Burman
**Perkins Coie LLP**
1201 Third Avenue
40th Floor
Seattle, WA  98101-3099
Tel:     (206) 359-8426
Fax:     (206) 359-9426
Email: dburman@perkinscoie.com

Kameron Parvin
**Perkins Coie LLP**
1201 Third Avenue
40th Floor
Seattle, WA  98101-3099
Tel:     (206) 359-6111
Fax:     (206) 359-7111
Email: kparvin@perkinscoie.com

Michael D. Broaddus
**Perkins Coie LLP**
1201 Third Avenue
40th Floor
Seattle, WA  98101-3099
Tel:     (206) 359-8664
Fax:     (206) 359-9664
Email: MBroaddus@perkinscoie.com

| Aptilo Networks, Inc. |
| --- |

Clyde Moody Siebman
**Siebman Reynolds Burg & Phillips LLP**
300 N. Travis Street
Sherman, TX  75090-0070
Tel:     (903) 870-0070
Fax:     (903) 870-0066
Email: siebman@siebman.com

Steven L. Wiser
**Thorelli & Associates**
70 W. Madison St.; #5750
Chicago, IL  60602
Tel:     (312) 357-0300
Fax:     (312) 357-0328
Email: steve@thorelli.com

Lawrence Augustine Phillips
**Siebman Reynolds Burg & Phillips LLP**
300 N. Travis Street
Sherman, TX  75090-9969
Tel:     (903) 870-0070
Fax:     (903) 870-0066
Email: shmdad@yahoo.com

Theodore J. Koerth
**Thorelli & Associates**
70 W. Madison St.; #5750
Chicago, IL  60602
Tel:     (312) 357-0300
Fax:     (312) 357-0328
Email: ted@thorelli.com

| Six Continents Hotels Inc. |
| --- |
| InterContinental Hotels Group Resources, Inc. |

John M. Guaragna
**DLA Piper US LLP**
401 Congress Avenue
Suite 2500
Austin, TX  78701-3799
Tel:     (512) 457-7000
Fax:     (512) 457-7001
Email: John.Guaragna@dlapiper.com

### Marriott International, Inc.

John M. Guaragna
**DLA Piper US LLP**
401 Congress Avenue
Suite 2500
Austin, TX  78701-3799
Tel:     (512) 457-7000
Fax:     (512) 457-7001
Email: John.Guaragna@dlapiper.com

John D. Kinton
**DLA Piper US LLP**
401 B Street
Suite 1700
San Diego, CA  92101
Tel:     (619) 699-2700
Fax:     (619) 699-2701
Email: john.kinton@dlapiper.com

Erin Penning
**DLA Piper US LLP**
401 B Street
Suite 1700
San Diego, CA  92101
Tel:     (619) 699-2862
Fax:     (610) 699-2700
Email: erin.penning@dlapiper.com

### Choice Hotels International, Inc.

Kevin P. Anderson
**Wiley Rein LLP**
1776 K Street, NW
Washington, DC  20006
Tel:     (202) 719-7000
Fax:     (202) 719-7049
Email: kanderson@wileyrein.com

Gregory R. Lyons
**Wiley Rein LLP**
1776 K Street, NW
Washington, DC  20006
Tel:     (202) 719-7356
Fax:     (202) 719-7049
Email: glyons@wileyrein.com

Michael Charles Smith
**Siebman Reynolds Burg Phillips**
   **& Smith, LLP-Marshall**
713 South Washington
Marshall, TX  75670
Tel:     (903) 938-8900
Fax:     (972) 767-4620
Email: michaelsmith@siebman.com

*Ramada Worldwide, Inc.*
*EthoStream, LLC*

Dean Danyl Hunt
**Baker & Hostetler LLP**
1000 Louisiana
Suite 2000
Houston, TX  77002-5018
Tel:    (713) 751-1600
Fax:    (713) 751-1717
Email: dhunt@bakerlaw.com

Christina J. Moser
**Baker & Hostetler**
1900 East Ninth Street
3200 National City Center
Cleveland, OH  44114
Tel:    (216) 861-7818
Fax:    (216) 696-0740
Email: cmoser@bakerlaw.com

*Best Western International, Inc.*

Christopher M. Joe
**Buether Joe & Carpenter, LLC**
1700 Pacific; Ste. 2390
Dallas, TX 75201
Tel:    (214) 665-3604
Fax:    (214) 665-5904
Email:  chris.joe@bjciplaw.com

Brian Andrew Carpenter
**Buether Joe & Carpenter, LLC**
1700 Pacific; Ste. 2390
Dallas, TX 75201
Tel:    (214) 665-3600
Fax:    (214) 665-3601
Email:  brian.carpenter@bjciplaw.com

Andrea L. Marconi
**Squire Sanders & Dempsey-Phoenix**
Two Renaissance Square
40 North Central Avenue; Suite 2700
Phoenix, AZ  85004-4498
Tel:    (602) 528-4845
Fax:    (602) 253-8129
Email:  amarconi@ssd.com

David E. Rogers
**Squire Sanders & Dempsey-Phoenix**
Two Renaissance Square
40 North Central Avenue; Suite 2700
Phoenix, AZ  85004-4498
Tel:    (602) 528-4122
Fax:    (602) 253-8129
Email:  drogers@ssd.com

Donald A. Wall
**Squire Sanders & Dempsey-Phoenix**
Two Renaissance Square
40 North Central Avenue; Suite 2700
Phoenix, AZ  85004-4498
Tel:    (602) 528-4000
Fax:    (602) 253-8129
Email:  dwall@ssd.com

### *LodgeNet Interactive Corporation*

Cynthia Lopez Beverage
**Morrison & Foerster LLP**
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC  20006
Tel:     (202) 887-6950
Fax:     (202) 785-7635
Email:  cbeverage@mofo.com

Jennifer Parker Ainsworth
**Wilson Robertson & Cornelius PC**
909 ESE Loop 323
Suite 400
P.O. Box 7339
Tyler, TX  75711-7339
Tel:     (903) 509-5000
Fax:     (903) 509-5092
Email:  jainsworth@wilsonlawfirm.com

Mark E. Ungerman
**Morrison & Foerster LLP**
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC  20006
Tel:     (202) 887-1535
Fax:     (202) 887-0763
Email:  mungerman@mofo.com

Robert David Daniel
**Beck Redden & Secrest LLP**
One Houston Center
1221 McKinney St.; Suite 4500
Houston, TX  77010-2020
Tel:     (713) 951-3700
Fax:     (713) 951-3720
Email:  bddaniel@brsfirm.com

### *Pronto Networks, Inc.*

Aden Martin Allen
**Wilson Sonsini Goodrich & Rosati**
900 South Capital of Texas Highway
Las Cimas IV; Fifth Floor
Austin, TX  78746
Tel:     (512) 338-5400
Fax:     (512) 338-5499
Email:  aallen@wsgr.com

Jose Carlos Villarreal
**Wilson Sonsini Goodrich & Rosati**
8911 Capital of Texas Highway
Westech 360; Ste. 3350
Austin, TX  78759-7247
Tel:     (512) 338-5400
Fax:     (512) 338-5499
Email:  jvillarreal@wsgr.com

| *Nomadix, Inc.* | |
|---|---|
| Elizabeth L. DeRieux<br>**Capshaw DeRieux, LLP**<br>1127 Judson Road<br>Suite 220<br>Longview, TX  75601-5157<br>Tel:     (903) 233-4816<br>Fax:     (903) 236-8787<br>Email:  edrieux@capshawlaw.com | Sidney Calvin Capshaw, III<br>**Capshaw DeRieux, LLP**<br>1127 Judson Road<br>Suite 220<br>Longview, TX  75601-5157<br>Tel:     (903) 233-4826<br>Fax:     (903) 236-8787<br>Email:  ccapshaw@capshawlaw.com |

| *BestComm Networks, Inc.* | |
|---|---|
| Morris C. Carrington<br>**Mehaffy & Weber – Beaumont**<br>P.O. Box 16<br>Beaumont, TX  77704-0016<br>Tel:     (409) 835-5011<br>Fax:     (409) 835-5177<br>Email:  mccarrington@mehaffyweber.com | David J. Leonard<br>**Leonard & Felker**<br>P.O. Box 19101<br>Tucson, AZ  85731<br>Tel:     (520) 622-7737<br>Fax:     (623) 321-8085<br>Email:  dovidle@aol.com |