**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| LINKSMART WIRELESS | § | |
| TECHNOLOGY, LLC | § | |
| | § | |
| vs. | § | CASE NO. 2:08-CV-264-DF-CE |
| | § | |
| T-MOBILE USA, INC., ET AL. | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

After considering the submissions and the arguments of counsel, the court issues the following order concerning the claim construction issues:

## I.     Introduction

In this case, the plaintiff Linksmart Wireless Technology, LLC ("Linksmart") contends that the defendants Cisco Systems, Inc., T-Mobile USA, Inc., SBC Internet Services, Barnes & Noble Booksellers, Inc., Wayport, Inc., Mailboxes Etc., Inc., McDonald's Corp., LodgeNet Interactive Corp., Choice Hotels International, Marriott International, Inc., Intercontinental Hotels Group Resources, Inc., Six Continents Hotels, Inc., Best Western International, Inc. ("BWI"), iBAHN General Holdings, Corp., Ethostream, LLC, Ramada Worldwide, Inc., Pronto Networks, Inc., and Aptilo Networks, Inc. infringe various claims of United States Patent No. 6,779,118 ("the '118 patent"). This memorandum addresses the parties' various claim construction disputes. The memorandum will first briefly address the technology at issue in the case and then turn to the merits of the claim construction issues.

## II.    Background of the Technology

The '118 patent is titled "User Specific Automatic Data Redirection System." The invention is described in the patent's Abstract:

A data redirection system for redirecting user's data based on a stored rule set. The

redirection of data is performed by a redirection server, which receives the redirection rule sets for each user from an authentication and accounting server, and a database. Prior to using the system, users authenticate with the authentication and accounting server, and receive a network address. The authentication and accounting server retrieves the proper rule set for the user, and communicates the rule set and the user's address to the redirection server. The redirection server then implements the redirection rule set for the user's address. Rule sets are removed from the redirection server either when the user disconnects, or based on some predetermined event. New rule sets are added to the redirection server either when a user connects, or based on some predetermined event.

Claim 1 is a representative claim that illustrates the scope of the invention:

A system comprising:
a database with entries correlating each of a plurality of user IDs with an individualized rule set;
a dial-up network server that receives user IDs from users' computers;
a redirection server connected to the dial-up network server and a public network, and
an authentication accounting server connected to the database, the dial-up network server and the redirection server;
wherein the dial-up network server communicates a first user ID for one of the users' computers and a temporarily assigned network address for the first user ID to the authentication accounting server;
wherein the authentication accounting server accesses the database and communicates the individualized rule set that correlates with the first user ID and the temporarily assigned network address to the redirection server; and
wherein data directed toward the public network from the one of the users' computers are processed by the redirection server according to the individualized rule set.

## III.    General Principles Governing Claim Construction

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999) (quoting *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989)). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) (quoting *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed. Cir. 1991)).   Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. 35 U.S.C. § 112; *id.* at 978.  A patent's claims "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979.  "For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Id*.  "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims.  Otherwise, there would be no need for claims.  *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).  The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification.  *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992).  And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments.  *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).  This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  In *Phillips*, the court set forth several guideposts that courts should follow when construing claims.   In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee

3

is entitled the right to exclude." *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)) (emphasis added).  To that end, the words used in a claim "are generally given their ordinary and customary meaning." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313.  This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention.  *Id.*  The patent is addressed to and intended to be read by others skilled in the particular art.  *Id.*

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.  Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978).  Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims.  *Id.* at 1314-17.  The Supreme Court stated long ago that "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878).  In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and

4

> intended to envelop with the claim.  The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316.  Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation.  The prosecution history helps to demonstrate how the inventor and the PTO understood the patent.  *Id.* at 1317.  Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings.  *Id.*  Nevertheless, the prosecution history is intrinsic evidence.  *Id.*  That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.  *Id.*

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony.  *Id.*  The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes.  *Phillips*, 415 F.3d at 1319-24.  The approach suggested by *Texas Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term.  *Id.* at 1320-21 (quoting *Vitronics*, 90 F.3d at 1582). According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent."  *Id.* at 1321.  *Phillips* emphasized that "[t]he patent

system is based on the proposition that the claims cover only the invented subject matter." *Id.* What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id.* The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id.* at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. *Phillips*, 415 F.3d at 1322. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. *Id.* at 1317-19. In doing so, the court emphasized that claim construction issues are not resolved by any "magic formula." *Id.* at 1324. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant. *Id.* at 1324.

In construing the claim terms, the court must also determine whether any claim terms are invalid as being indefinite. The statutory requirement of definiteness states that the claims must "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. "[T]he purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). "The definiteness requirement, however, does not compel absolute clarity. Only claims not amenable to construction or insolubly ambiguous are indefinite." *Id.* (internal quotations omitted).

IV.   **Agreed Terms**

- "combination of" means "two or more of"

- "user" – Ordinary meaning, no construction is necessary.

- "redirects" / "redirecting" mean "causes [causing] to be sent to a location other than the one requested by the user"

- "authentication accounting server" means "a server that determines whether a user ID is authorized to access the network"

V.   **Disputed Terms**

A.   **"user IDs"**

Claim 1 contains the term "user IDs": "a database with entries correlating each of a plurality of *user IDs* with an individualized rule set," "wherein the dial-up network server communicates a first *user ID* for one of the users' computers . . . to the authentication accounting server," and "wherein the authentication accounting server . . . communicates the individualized rule set that correlates with the first *user ID*."  The term appears throughout the specification, e.g., "when the user connects to the local network . . . the *user's ID* and password are sent to the authentication accounting server."  ('118 patent, 2:66-3:1) (emphasis added).  According to Linksmart, the court does not need to construe "user IDs."  Alternatively, if the court determines that a construction is necessary, Linksmart's proposed construction is "identification of the user."  The defendants assert the following construction: "a unique identification code for a particular person."

The defendants contend that the user ID must be a unique identification assigned to a particular person.  In support of their argument, the defendants note that the purpose of the invention, according to the patent's Summary of Invention, is "to allow the redirection, blocking,

or allowing, of specific data traffic for *specific users*." ('118 patent, 2:62-64) (emphasis added).

Also, U.S. Provisional Application No. 60/084,014 ("'014 application"), which is fully incorporated

by reference, states that "[e]ach redirection is handled individually such that every user can have a

different designated site." ('014 application, at 8).  But nothing in the specification requires that

each person must be assigned a unique user ID–a single user ID could be assigned to a group of

persons.  Therefore, the court construes the term to mean "identification of the user or users."

## B.      "individualized rule set"

Claim 1 contains the term "individualized rule set": "wherein the authentication accounting

server accesses the database and communicates the *individualized rule set* that correlates with the

first user ID" and "wherein data . . . are processed by the redirection server according to the

*individualized rule set*."  Although "individualized rule set" does not appear in the specification, the

phrase "rule set" is used frequently:

> The *rule sets* specify elements or conditions about the user's session.  *Rule sets* may
> contain data about a type of service which may or may not be accessed, a location
> which may or may not be accessed, how long to keep the *rule set* active, under what
> conditions the *rule set* should be removed, when and how to modify the *rule set*
> during a session, and the like.

('118 patent, 4:41-47) (emphasis added).

The plaintiff defines "individualized rule set" as "elements or conditions which apply during

a user's session."  According to the defendants, this term means "filtering and redirection rules for

a particular user ID, which apply during an authorized session."  The three primary differences

between the parties' proposed constructions are: (1) "elements or conditions" vs. "filtering and

redirection rules"; (2) association with a specific user ID; and (3) "user's session" vs. "authorized

session."

First, Linksmart argues that "individualized rule set" should be broadly construed to cover "elements or conditions." The specification explicitly states that "rule sets specify *elements or conditions*." ('118 patent, 4:41-42) (emphasis added). In response, the defendants assert that the patent uses the phrase "filtering and redirection information" interchangeably with the term "rule set," e.g., "[t]he database also contains personalized filtering and redirection information" and "[t]he redirection server uses the filter and redirection information . . . to either allow packets to pass through . . . , block . . . , or modify." ('118 patent, 3:3-4, 3:15-19). But the specification also explains that the rule set may contain data about "how long to keep the rule set active" and "when and how to modify the rule set during a session." ('118 patent, 4:42-47). The narrow "filtering and redirection information" construction would exclude these two alternatives. Therefore the court will adopt the "elements or conditions" construction.

Second, the defendants' proposal requires the "individualized rule set" to be associated with a particular user ID. Linksmart argues that nothing in the specification requires the rule set to be tied to a specific user ID. But the specification refers to a "rule set," while the claims use the term "*individualized* rule set." Because the modifier "individualized" is included, the court will construe the term to require a link to a specific user ID.

Third, the plaintiff contends that the rule set is applied during a "user's session," but the defendants assert that the rule set is applied during an "authorized session." The specification explains that "[t]he rule sets specify elements or conditions about the *user's session*." ('118 patent, 4:41-42) (emphasis added). "Authorized session" is not found in the specification. As such, the court is persuaded that the rule set applies during a "user's session." In all, the court construes the term "individualized rule set" as "elements or conditions for a particular user ID that apply during

a user's session."

### C.      "user's rule set"

Claim 15 contains the term "user's rule set": "a redirection server programed with a *user's rule set* correlated to a temporarily assigned network address."   According to Linksmart, no construction of this term is necessary.  Alternatively, Linksmart proposes the following construction: "elements or conditions about the user's session."   The defendants (except BWI) contend that "user's rule set" means "filtering and redirection rules for a particular user which apply during an authorized session."  Finally, BWI's proposed construction is "filtering and redirection rules unique to a particular user which apply during an authorized session."

The defendants assert that "user's rule set" requires "filtering and redirection rules" and "an authorized session."  For the reasons discussed above in "individualized rule set," the court declines to adopt these limitations.

BWI argues that the rules must be "unique to a particular user."  BWI notes that claim 15 refers to "user" in the singular form: "*a* user's rule set" and "*the* user."  But when used with an open-ended transition, the indefinite article "a" means "one or more" except in rare circumstances where the patentee clearly intended to limit the term to a single item.  *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008).  The subsequent use of "the user" does not change the presumption of plurality.  *Id.*  To support its argument, BWI notes that the specification explains, "Rule sets . . . are unique for each user ID, or a group of user IDs." ('118 patent, 4:40-41).  BWI argues that the language quoted above presents two distinct options–the rules are unique for a single user ID or unique for a group of user IDs–and the claim language shows that the patentees chose the first option.

The court is not persuaded that the patentees clearly intended to limit "user's rule set" to a single user. The claim language does not disclaim the "group of user ID's" embodiment in the specification. Thus court construes "user's rule set" to mean "elements or conditions that apply during a user's or users' session."

### D.    "control data passing"

The term "control data passing" is found in the preamble of claim 25: "wherein the user's rule set contains at least one of a plurality of functions used to *control data passing* between the user and a public network." The term "control data passing" is not found in the specification. According to Linksmart, the ordinary meaning of this term is self-evident and no construction is necessary. The defendants' proposed construction is "filter and redirect data sent."

The Summary of the Invention describes the purpose of the invention: "The present invention allows for creating and implementing dynamically changing rules, to allow the *redirection, blocking, or allowing, of specific data traffic for specific users*, as a function of database entries and the user's activity." ('118 patent, 2:61-65) (emphasis added). Other text in the specification confirms this functionality: "The redirection server . . . is programed to implement . . . checking data packets and blocking or allowing the packets . . . [and] performing the physical redirection of data packets . . . ." ('118 patent, 4:59-65). These passages indicate how the claimed invention enables control of the data passing through the redirection server. As such, the court construes this term to mean "redirect, allow, or block data traffic."

### E.    "processed" / "processing"

Claim 1 contains the term "processed": "wherein data directed toward the public network from the one of the users' computers are *processed* by the redirection server according to the

individualized rule set." Claim 8 contains the term "processing": "*processing* data directed toward the public network from the one of the users' computers according to the individualized rule set." As in the term "individualized rule set," Linksmart believes that no construction is necessary, and the defendants wish to limit the scope of this term to filtering and redirecting.

Based on the context of the claim language, it is evident that the "processed" or "processing" step performed by the redirection server is analogous to the redirection server "control[ling] data passing" to the public network. Thus, "processed" and "processing" should be given the same construction as "control data passing": "redirect[ing], allow[ing], or block[ing] data traffic."

F.      **"dial-up network server"**

The term "dial-up network server" is found in claim 1: "a *dial-up network server* that receives user IDs from users' computers" and "wherein the *dial-up network server* communicates a first user ID for one of the users' computers and a temporarily assigned network address for the first user ID to the authentication accounting server." "Dial-up network server" is described in the following passage from the specification:

> The PC [] first connects to the *dial-up network server* []. The connection is typically created using a computer modem, however a local area network (LAN) or other communications link can be employed. The *dial-up network server* [] is used to establish a communications link with the user's PC [] using a standard communications protocol.

('118 patent, 3:57-63). Linksmart's proposed construction is "a server that is used to establish a temporary link to a network." The defendants contend that this term means "a server on the network that receives a connection via a modem, or establishes a connection via a modem, where the modem dials a phone number over a telephone line."

The defendants argue that the commonly understood meaning of "dial-up" requires the use

12

of a modem to establish a dial-up connection over a telephone line.  The defendants also note that the box labeled "Modem Array & Built-in dialup networking software" in Figure 2 of the '014 application corresponds to the "Dial-up Networking Server" in Figure 2 of the '118 patent.  In response, Linksmart points to the language of the specification, quoted above, which explains that the connection to the dial-up network server "is typically created using a computer modem, *however a local area network (LAN) or other communications link can be employed*." ('118 patent, 3:58-60) (emphasis added).  The court must "adopt a definition that is different from the ordinary meaning [of a claim term] when 'the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history.'" *Edward Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366-67 (Fed. Cir. 2002)).  Here, the specification clearly teaches that connections to the dial-up networking server are not limited to the use of a modem, but may also include other types of connections.  Because the patentee defined "dial-up networking server" in a manner that differs from its ordinary meaning, this term is not limited to dial-up or modem connections.  Therefore the court construes "dial-up network server" to mean "a server that is used to establish a communications link with the user's PC."

### G.     "redirection server"

Claim 1 contains the term "redirection server": "a *redirection server* connected to the dial-up network server and a public network," "wherein the authentication accounting server . . . communicates the individualized rule set . . . to the *redirection server*," and "wherein data directed toward the public network from the one of the users' computers are processed by the *redirection server* according to the individualized rule set."  "Redirection server" is found

throughout the '118 patent's specification:

> The *redirection server* [] is logically located between the user's computer [] and the network, and controls the user's access to the network. . . .   The *redirection server* [] receives the IP address and rule set, and is programed to implement the rule set for the IP address, as well as other attendant logical decisions such as: checking data packets and blocking or allowing the packets as a function of the rule sets, performing the physical redirection of data packets based on the rule sets, and dynamically changing the rule sets based on conditions.

('118 patent, 4:50-52 & 59-66) (emphasis added).  The plaintiff asserts the following construction of this term:  "hardware and/or software that dynamically controls the user's access to the network."  The defendants' proposed construction is "a server that causes a user to be sent to a location other than the one requested by the user."

According to the defendants, the plain meaning of "redirection" requires the redirection server to redirect traffic, i.e., " cause[] a user to be sent to a location other than the one requested by the user."   But the specification teaches that the redirection server performs functions other redirecting, such as blocking or allowing packets.  This additional redirection server functionality is confirmed by dependent claims 2 and 3: "wherein the redirection server further blocks the data" and "wherein the redirection server further allows the data."  Based upon the specification's explicit description of the redirection server, quoted above, the court construes the term to mean "a server logically located between the user's computer and the network that controls the user's access to the network."

### H.     "temporarily assigned network address"

Claim 1 contains the term "temporarily assigned network address": "wherein the dial-up network server communicates a first user ID for one of the users' computers and a *temporarily assigned network address* for the first user ID to the authentication accounting server."  Although

14

the specific term "temporarily assigned network address" is not found in the specification, similar

phrases are used instead: "[t]he IP address temporarily assigned to the end user is [] sent back to the

end user for use in connecting in the network," ('118 patent, 3:10-12), and "[u]pon a successful user

authentication, the dial-up network server [] completes the negotiation and assigns an IP address to

the user," ('118 patent, 5:57-59).  Linksmart's proposed construction is "an address that identifies

a user for the duration of a networking session."  On the other hand, the defendants argue that this

term means "an address assigned to a user only for the duration of an authorized session."

The parties dispute whether the network address must be temporarily assigned or can it be

a pre-existing, permanently assigned address.  In support of its proposal covering permanent

addresses, Linksmart points to the following language from the specification: "In the preferred

embodiment Point to Point Protocol (PPP) is used . . . to dynamically assign the PC [] an IP address

from a list of available addresses.  However, [in] other embodiments . . . , the IP address may also

be *permanently assigned* to the PC []."  ('118 patent, 3:63-4:2) (emphasis added).  Thus, according

to Linksmart, the invention should not be limited to the preferred embodiment, which uses

temporarily assigned IP addresses.  Although the specification discloses both temporary and

permanent addresses, the patentee claimed "temporarily assigned network address" not "network

address" generally. The "temporarily assigned" limitation excludes embodiments that are permanent

or not assigned by the claimed system.  Unlike the term "dial-up networking server" where the

patentee explicitly defined the term in a manner that differs from its ordinary meaning, the

specification provides no specialized definition for "temporarily assigned network address."  Thus,

the court will construe the term according to its plain language, which requires temporary

assignment.  The court is persuaded, however, by the plaintiff's argument that the network address

15

is used to identify users.  The '118 patent's Background of the Invention explains that "the end user would be identified by the temporarily assigned IP address."  ('118 patent, 1:35-37).  In all, "temporarily assigned network address" is construed to mean "an address that is assigned to a user and identifies a user only for the duration of a networking session."

## I.       "to control passing between the user and a public network"

The term "to control passing between the user and a public network" is found in claim 15: "wherein the rule set contains at least one of a plurality of functions used *to control passing between the user and a public network*."  A word appears to be missing from this term; the verb "control" should have a direct object.  Linksmart asserts that this term means "to control data passing between the user and a public network."  The defendants contend that this term is indefinite.

Claim 25 contains a limitation similar to the disputed term: "wherein the user's rule set contains a least one of a plurality of functions used to control *data* passing between the user and a public network."  Also, the specification states, "The redirection server [] programs the rule set and IP address so as to control . . . the user's *data* as a function of the rule set."  ('118 patent, 6:1-3) (emphasis added).  Thus, it is apparent that the word "data" was inadvertently omitted from the claim term.  The defendants argue that this term is indefinite because it is subject to two reasonable interpretations: "control data passing" or "control the passing of HTTP requests."  But HTTP requests are a form of data.  As the omission of "data" is an obvious, minor typographical error, the claim is not indefinite.  *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003).  Therefore, the court's construction of "to control passing between the user and a public network" is "to control data passing between the user and a public network."

### J.      "automated modification"

Claim 15 contains the term "automated modification": "wherein the redirection server is configured to allow *automated modification* of at least a portion of the rule set correlated to the temporarily assigned network address."   Although the specification does not contain the term "automated modification," the modification of rule sets is discussed, e.g., "[r]ule sets may contain data about . . . when and how to modify the rule set during a session," ('118 patent, 4:46-47), and "[t]he redirection server . . . is programed to implement . . . other attendant logical decisions such as . . . dynamically changing the rule sets based on conditions." ('118 patent, 4:59-66).  Linksmart asserts that no construction of this term is necessary.   Alternatively, Linksmart proposes the following construction:   "a change by the system based on a condition."   On the other hand, the defendants contend that "automated modification" means "a change by the system without a request or instruction by a person."

The parties agree that "modification" means "a change by the system" but disagree on the meaning of "automated."   Linksmart argues that "automated" means "based on a condition."   In support of its proposed construction, the plaintiff cites the above-quoted language from the specification: "dynamically changing the rule sets *based on conditions*."   Linksmart's proposal does not distinguish an automated or dynamic modification from a manual modification, however–the phrase "based on a modification" provides no clarification.   On the other hand, the defendants contend that automated means "without a request or instruction by a person."   But Linksmart notes that an automated modification may occur in response to a user's action.   For example, claim 17, which depends from claim 15, states that "the redirection server is configured to allow modification of at least a portion of the rule set as a function of the data transmitted to or from the user."   Thus,

17

user action may prompt an automatic modification.  As such, the court adopts the following construction: "a change by the system without a request or instruction to change from a user."

**K.      "location the user access"**

Claim 15 contains the term "location the user access": "wherein the redirection server is configured to allow modification of at least a portion of the rule set as a function of some combination of time, data transmitted to or from the user, or *location the user access*."  This claim term is grammatically incorrect and may have a word missing.  The specification explains that "a user may be periodically redirected to a location, based on the number of other factors, such as the number of locations accessed, the time spent at a location, the types of locations accessed, and other such factors."  ('118 patent, 7:48-52).  Linksmart argues that this term means "location or locations that the user accesses."  The defendants allege that "location the user access" is indefinite.

The defendants assert that "location the user access" is ambiguous because it is susceptible to more than one meaning.  According to the defendants, this term may mean "location that the user accesses," "location the user attempts to access," "location from which the user accesses," "location the user is allowed to access," "number of locations the user accessed," and "types of locations the user accessed."  During reexamination, Linksmart filed an amendment to claim 15 that read, "location the user *attempts to* access."  (Dkt. No. 414, Ex. 2, at 29).  In addition, when accusing Cisco of infringement, Linksmart asserted that the term means "the location *from which* the user accesses the Accused Instrumentality."  (Dkt. No. 414, Ex. 2, at 53).

A district court cannot correct errors in a patent if the proposed correction is subject to reasonable debate.  *Novo Indus.*, 350 F.3d at 1357.  In *Novo Industries*, the disputed claim term was "stop means formed on a rotatable with said support finger."  *Id.* at 1352.  The plaintiff argued that

this term contained an obvious typographical error and proposed two different corrections: "stop means on said support finger" and "stop means formed on a rotatable support finger." *Id.* The Federal Circuit held that the error was not amenable to correction by the court, partly because the plaintiff itself suggested two different corrections, and thus the proposed correction was subject to reasonable debate. *Id.* at 1357. Likewise, in this case, "location the user access" has an obvious typographical or grammatical error, and the correction is subject to reasonable debate. Linksmart has suggested one correction to this court, offered a different correction to the PTO, and asserted yet another theory to Cisco.[1] Therefore, the term "location the user access" is insolubly ambiguous. As such, claim 15 is indefinite.

L.   **"modifying at least a portion of the user's rule set while the user's rule set remains correlated to the temporarily assigned network address"**

The term "modifying at least a portion of the user's rule set while the user's rule set remains correlated to the temporarily assigned network address" is found in claim 25. The plaintiff argues that no construction of this term is necessary in light of other constructions. Alternatively, Linksmart proposes the following construction: "changing at least one of the elements or conditions about the user's session during the session." The defendants contend that "modifying at least a portion of the user's rule set while the user's rule set remains correlated to the temporarily assigned network address" means "changing at least one of the rules in the user's rule set without ending the authorized session."

The primary difference between the parties' proposed constructions is whether termination

---

[1]      Linksmart argues that its infringement contentions against Cisco are irrelevant for purposes of claim construction because they are litigation-related documents. But in *Novo Industries*, the Federal Circuit considered litigation-related positions in holding that the proposed correction was subject to reasonable debate. *See id.* ("Indeed, Novo itself suggested two different constructions to the district court . . . .").

of the user's session, which may be a form of a rule change, is covered by the patent term. According to the defendants, when the user's session is terminated, the system breaks the correlation between the user's rule set and the temporarily assigned network address.  (*See* '118 patent, 3:21-26 ("When the user terminates the connection with the network, . . . the authentication accounting server . . . sends a message to the redirection server telling it to remove any remaining filtering and redirection information for the terminated user's temporary IP address."); 4:67-5:4 ("When the redirection server [] receives information regarding a terminated session . . . , the redirection server [] removes any outstanding rule sets and information associated with the session.")).  But Linksmart argues that these quoted passages from the specification are preferred embodiments, and the claim should not be construed to exclude modifications that terminate the session.

The court is persuaded by Linksmart's argument.  The system may first terminate the user's session, then break the correlation between the temporarily assigned network address and the user's rule set.  The court therefore construes "modifying at least a portion of the user's rule set while the user's rule set remains correlated to the temporarily assigned network address" to mean "changing at least one of the elements or conditions in the 'user's rule set' during the session."

## M. "database"

Claim 1 contains the term "database": "a *database* with entries correlating each of a plurality of user IDs with an individualized rule set."  The term "database" appears throughout the specification. The plaintiff asserts that no construction of "database" is necessary.  If a construction is required, the plaintiff proposes "a structured set of data held in a computer."  In contrast, BWI contends that this term means a "relational database that stores data in a collection of records wherein each record has at least one field common to other records."

20

BWI argues that "database" must be construed as a relational database.  In support of its proposed construction, BWI quotes the following language from the specification: "The database 206 *is* a relational database which stores the system data." ('118 patent, 4:33-34) (emphasis added). BWI contends that this language does not state that the database *could be* or *may be* a relational database; instead, it says that the database *is* a relational database.  But the quoted sentence is located within the "Detailed Description of the Invention"; this section begins with "[i]n the following embodiments of the invention." ('118 patent, 3:45).  Figure 2 and the "database 206," discussed in the Detailed Description, illustrate embodiments of the claimed invention.  Although relational databases are a preferred embodiment, nothing in the claims or specification exclude other forms of data storage, such as a flat file.  Therefore, the court construes "database" to mean "a structured set of data held in a computer."

### N.      "entries"

Claim 1 contains the term "entries": "a database with *entries* correlating each of a plurality of user IDs with an individualized rule set."  The specification states that "[t]he present invention allows for creating and implementing dynamically changing rules, to allow the redirection, blocking, or allowing, of specific data traffic for specific users, as a function of database *entries* and the user's activity."  Linksmart states that no construction is necessary, or alternatively, proposes "records in a database."  BWI asserts the following construction:  "records in a database, each record including a user ID and a unique rule set individualized for the user ID."

According to BWI, the rule set must be unique and individualized for each user ID.  But claim 7, which depends from claim 1, explains that the entries correlate a plurality of users' IDs with a common individualized rule set.  As such, the term "entries" does not require the entries to

correlate a unique rule set to each user ID.[2] BWI also asserts that each record must include a user ID and a rule set. BWI relies on a portion of the specification that illustrates a record containing a user ID and rule set. ('118 patent, 6:11-22). This portion of the specification describes an embodiment, however. The claim language states that the entries *correlate*, not *include*, the user IDs and rule sets. Nothing in the patent excludes a database with user IDs and rule sets stored in separate tables. Finally, the remainder of BWI's construction merely restates what is required in the claim language–the correlation of user IDs with rule sets. As such, the court construes "entries" to mean "records in a database."

## VI.    Conclusion

The court adopts the constructions set forth in this opinion for the disputed terms of the '118 patent. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the court.

---

[2]    At the May 25, 2010 claim construction hearing, counsel for BWI appeared to argue that the court should not consider claim 7 when construing "entries" because "claim 7 hasn't been asserted in this lawsuit." A person of ordinary skill reading the '118 patent would discern, however, that claim 7 is intrinsic evidence regardless of whether Linksmart would later decline to assert that claim. *See also Phillips*, 415 F.3d at 1315 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.").

SIGNED this 30th day of June, 2010.

CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE